UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| David Julius Brown, | ) | |
| | ) | C/A No.: 4:14-cv-2470-RMG-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I.  RELEVANT BACKGROUND

### A.    Procedural History

The Plaintiff, David Julius Brown, filed an application for SSI on April 11, 2011, alleging disability beginning January 1, 2011. His application was denied at all administrative levels, and upon reconsideration. Plaintiff filed a request for a hearing. A hearing was held on December 13, 2012, at which time the Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on March 22, 2013, finding Plaintiff was not disabled within the meaning of the Act.

1

(Tr. 11-23). On May 29, 2014, the Appeals Council denied Plaintiff's request for review. (Tr. 1-5). The Appeals Council's denial of Plaintiff's request for review made the ALJ's decision the Commissioner's final decision. Plaintiff filed this action on June 19, 2014, in the United States District Court for the District of South Carolina.

**B.    Plaintiff's Background and Medical History**

**1.    Introductory Facts**

Plaintiff was born on August 17, 1982, and was 28 years old on the date the application was filed. (Tr. 21). Plaintiff has no past relevant work.  Plaintiff alleges disability due to seizures, a brain tumor, and numbness on the right side of his body. (Pl. Br. at 4.).

**2.    Medical Records and Opinions**

The parties have both provided a thorough review of the medical evidence before the ALJ in this case in their respective briefs.  The Court dispenses with a lengthy recitation thereof here, and instead will note relevant facts and records as necessary to the Report.

**C.    The Administrative Proceedings**

**1.    The Administrative Hearing**

a.    Plaintiff's Testimony

Plaintiff testified that he was 30 years old. He had a two year old daughter. He lived in a house with his aunt, his uncle, and his cousins. He was 5'11" and weighed 162 pounds at the time of the hearing, but he normally weighed about 175 or 180 pounds. He was right-handed and he was single. He did not have a source of income and he did not have a driver's license. He had a permit, but he never got a driver's license. He completed 9th grade and received training in the Job Corps doing apartment maintenance and

2

brick masonry. (Tr. 34-35).

Plaintiff indicated that he smoked a pack of cigarettes every two-and-a-half days. He had stopped drinking a year-and-a-half prior to the hearing. Plaintiff testified that he smoked marijuana "from time to time" (Tr. 36-37)

Plaintiff took Keppra and Dilanton as medications. He reported that his medications had been increased several times and he was now on the maximum dose. Upon inquiry as to when he had started consistently taking his medications, Plaintiff stated that after his biopsy he did not take some of the pain killers. Plaintiff indicated that if he did not take the Keppra it was because he had fallen asleep or had forgotten, but it was the one medication that he always tried to make sure he took. The ALJ cited one record (from August 2011) where Plaintiff had stated the Keppra was too expensive. Plaintiff answered that he did not have the money for Keppra at that time, because it was $150 for one month's supply. Two weeks later (in approximately September of 2011) Plaintiff started taking the medication consistently because the doctor gave him samples of Keppra that lasted six months until he was able to receive Medicaid (Tr. 37-39).

Plaintiff testified that he woke up around 6:00 every morning to take his medication. After that he could not go back to sleep. He helped his daughter get dressed for daycare. She lived with her mother, but sometimes Plaintiff stayed at their house. Usually he stayed home during the weekend and went to his daughter's house on the weekends. If he was at home he woke up, took the Keppra, and tried to eat something. The Keppra did "not agree with him" so he tried to eat. He would sit outside and talk on the phone and smoke a cigarette. His aunt did the cooking. Plaintiff used to wash his own clothes, but now everyone helped him because he had the seizures. He did small chores like bring in a handful of wood or

3

help bring in the groceries. He watched over the 12-year-old kids. He ate dinner around 7:00 or 8:00 and went to bed around 11:00. When he was with his daughter he would also get up at 6:00 in the morning and watch TV with her. He mostly watched TV and sat at home with his daughter. He was able to clean up after her, wash her clothes, and microwave her food. He helped with the grocery shopping about once a month. He went to Jehovah Witness meetings about three times a month. He also visited friends at their houses. Prior to his seizures Plaintiff worked for his uncle (Tr. 39-43).

Plaintiff stated that he could not work because he could not move his right arm. He indicated that his right arm was very weak; and that he had seizures and headaches. He stated that the (overhead) lighting in the hearing was "killing" him. Plaintiff testified that he had two or three seizures in a week. Plaintiff indicated that sometimes he could tell if he was having a seizure because of a taste in his mouth, but other times he had no warning. During a seizure his whole right side was numb. If he had a grand mal seizure he would fall down, shake, and drool. When he woke, he did not know where he was or how long the seizure lasted (Tr. 43-44).

The ALJ cited evidence that documented surgery on June 17, 2011 and that after his surgery he had a single seizure episode but his seizures were mostly controlled on medication. The report stated that prior to the operation the spells were occurring four to five times a day. In light of this evidence, the ALJ asked Plaintiff if the seizures had stopped after the surgery. Plaintiff testified that he had not had grand mal seizures until _after_ the surgery, around October of 2011. Prior to the surgery he had experienced partial numbness or paralysis, but he had not had grand mal seizures. After the surgery he did not have partial numbness but started having grand mal seizures. (Tr. 44-45)

The ALJ asked Plaintiff about his driving permit. He no longer had a valid permit. The record

4

showed that Plaintiff had an incident when he was driving in March of 2011. Plaintiff stated that he was riding with someone else and just drove to switch the car so that the gas tank was next to the gas pump. He had an episode and after the episode he went to the doctor because he did not know what was wrong with him. He had not driven since that time (Tr. 45-46).

The attorney asked about Plaintiff's right-sided weakness. He had a feeling of weakness prior to the surgery, and the weakness he felt after the surgery was different. He could not lift his daughter, who weighed 35 pounds. On his right side, he stated could pick up a sandwich. He could pick up a hammer, but he could not swing it. He could lift small things. When he carried logs in the house he had to carry them like a baby. He walked with a slight limp. Plaintiff indicated that he started having seizures again in the fall of 2011. The frequency increased. Prior to the surgery there were signs that he was going to have a seizure, but after a while they came without warning. He had seizures in his sleep as well. (Tr. 47-48)

Plaintiff testified that he had two or three seizures a week, even while taking medication. He stated he had a "spell" a couple of days prior to the hearing. (Tr. 50). Three days prior to the hearing he had a "spell" and an older lady came and tried to help him. Id. When he was having a seizure he could not talk, he could only pray that it was quickly over. When the lady tugged on his arm and asked him if he was okay, he fell and hurt his hip. (Tr. 50-51).

He did not go to the hospital every time he had a seizure. As long as he did not hit his head, he did not go to the hospital. After a seizure, Plaintiff tried to "snap out of it" for about an hour. (Tr. 51). After a seizure his whole body hurt. He wanted to lie down. His chest, legs, and neck hurt. The doctor told him to avoid sharp corners if he felt he was going to have a seizure. He needed to try to sit or lie down. If he could not do that he needed to lean against something and get away from people. He should try to protect

5

his head. Every time he had a seizure he had right side weakness that lasted throughout the seizure and for a minute or two after the seizure. Plaintiff had a 3-month time period where he did not have seizures after his surgery and again after an increased dosage of Keppra (Tr. 51-53).

Plaintiff indicated that he was going to partake in a research study, which he hoped would help resolve his seizures so he would not have to take so many medications for his whole life (Tr. 53-54).

Plaintiff testified that Keppra gave him mood swings when he was sleepy. The Dilanton knocked him out so he took it at night. In the morning he was a little lightheaded. Plaintiff stated that he used to smoke more marijuana, but he did not smoke it as much since his surgery. He smoked marijuana 20 times in a month because of his headaches. Plaintiff said he had also told Dr. Giglio about the marijuana use. (Tr. 55-56). Plaintiff indicated that he also took Fiorsets for migraines. (Tr. 57).

b.    Vocational Evidence

The ALJ proposed the following hypothetical:

Assume a hypothetical individual of claimant's age, education, past work experience and impairments of astrocytoma and status post left-sided craniotomy for biopsy and debunking of a tumor. The individual has seizures and a history of asthma with the following limitations: lift and/or carry 50 pounds occasionally, 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday never climbing ladders, ropes, or scaffolds; occasionally climbing ramps, stairs, frequently balancing, stooping, kneeling, crouching, and crawling; avoid concentrated exposure to fumes, avoid all exposure to hazards.

(Tr. 60).

The VE stated that the hypothetical individual could perform work as a hand packager, with 1,500 jobs regionally, 105,000 jobs nationally, SVP of 2, and DOT of 920.587-018; order filler, medium, unskilled, SVP of 2, DOT of 222.487-014, with 1,400 jobs regionally and 102,000 jobs nationally; and

industrial cleaner, medium unskilled, SVP of 2, with 5,000 jobs regionally and 350,000 jobs nationally,

DOT of 381.687-018 (Tr. 60-61).

> The ALJ proposed a second hypothetical:
>
> Assume an individual with the same vocational factors and impairments as in hypothetical number one with the following limitations: lift and/or carry 20 pounds occasionally, 10 pounds, frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday never climbing ladders, ropes, scaffolds, occasionally climbing ramps, stairs; frequently balancing, stooping, kneeling, crouching, and crawling; avoid concentrated exposure to fumes; all exposure to hazards.

(Tr. 61).

The VE testified that there would be unskilled, light work available, such as agricultural sorters, with 2,400

jobs regionally and 168,000 jobs nationally, SVP of 2, and DOT of 529.687-186; seedling sorter, SVP

of 2, with 1,800 jobs regionally and 126,000 jobs nationally, DOT of 451.687-022; and garment sorter,

SVP of 2, with 1,400 jobs regionally and 98,000 jobs nationally, with DOT of 222.687-014. (Tr. 61-62).

> The ALJ proposed a third hypothetical:
>
> Assume a hypothetical individual with the same vocational factors and impairments as hypothetical number one, with the following limitations: lift and/or carry 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday; never climbing ladders, ropes, scaffolds; occasionally climbing ramps, stairs; frequently balancing, stooping, kneeling, crouching, crawling; avoid concentrated exposure to fumes; avoid all exposure to hazards.

(Tr. 62-63).

The VE stated that the individual would be able to perform sedentary work such as nut sorter, with

1,400 jobs regionally and 98,000 jobs nationally, SVP of 2, DOT of 521.687-086; bench hand

worker, SVP of 2, with 1,200 jobs regionally, 84,000 jobs nationally, and DOT of 715.684-026; and

hand trimmer, SVP of 2, 1,800 jobs regionally and 156,000 jobs nationally, DOT of 754.687-094 (Tr. 63).

The ALJ proposed a fourth hypothetical:

> Assume a hypothetical individual with the same vocational factors and limitations as in hypothetical number one except that the individual is limited as stated in claimant's testimony, considering all testimony to be credible.
>
> (Tr. 63-64).

The VE stated that the hypothetical individual would not be able to perform any work. The VE testified that his testimony was consistent with the DOT, SCO and supporting publications.

Plaintiff's attorney asked the VE if work would be available if the claimant was required to miss more than four days per month. The VE stated that there would be no full-time work available (Tr. 64).

**2.     The ALJ's Decision**

In the decision of March 22, 2013, the ALJ found the following:

1.     Claimant has not engaged in substantial gainful activity since April 11, 2011, the application date  (20 CFR 416.971 *et seq.*).

2.     Claimant has the following severe impairments: astrocytoma, status post left-sided craniotomy for biopsy and debulking of tumor; and a history of asthma. (20 CFR 416.920(c)).

3.     Claimant does not have an impairment or combination of impairments that meets or  medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)).

4.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). Claimant can lift and/or carry 10 pounds frequently and 20 pounds occasionally, sit about 6 hours in an 8 hour workday, and

stand and/or walk about 6 hours in an 8 hour workday. Claimant can frequently balance, stoop, kneel, crouch, and crawl, occasionally climb ramps or stairs, and never climb ladders, ropes, and scaffolds. Claimant should avoid concentrated exposure to fumes, and avoid all exposure to hazards.

5.   Claimant has no past relevant work (20 CFR 416.965).

6.   Claimant was born on August 17, 1982 and was 28 years old, which is defined as a younger individual age 18-49, on the date the application was filed  (20 CFR and 416.963).

7.   Claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 416.968).

9.   Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  Claimant has not been under a disability, as defined in the Social Security Act, since April 11, 2011, the date the application was filed (20 CFR 920(g)).

(Tr. 11-23).

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in her decision, and that reversal and  remand are appropriate in this case.  Specifically, Plaintiff raises the following issue in his brief, quoted verbatim:

I.    The ALJ did not perform the analysis of the treating and evaluating physician opinions required by 20 CFR §404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.

II.   The ALJ did not explain his findings regarding the Plaintiff's residual functional capacity, as required by Social Security Ruling 96-8p.

(Plaintiff's brief).

9

The Commissioner argues that the ALJ's decision is based on substantial evidence.

**A.**      **LEGAL FRAMEWORK**

**1.**      **The Commissioner's Determination–of–Disability Process**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1]

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

(4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d

---

[2]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

119 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

### B.    ANALYSIS

The primary issue raised by Plaintiff is the ALJ's evaluation of the opinion evidence of Dr. Pierre

Giglio. (Pl. Br. 19-28). Specifically, Plaintiff argues that Dr. Giglio, as his primary treating neurologist, is the most qualified medical professional to provide an opinion as to Plaintiff's condition, as he is the specialist who treated Plaintiff for his brain tumor. Plaintiff indicates that Dr. Giglio completed medical forms on June 29, 2012 containing opinions, which the ALJ failed to give controlling weight. Plaintiff notes that Dr. Giglio opined that Plaintiff had a number of functional limitations, and that the doctor estimated that on average he would likely be absent from work as a result of his impairment or medical treatment more than four days per month. At the hearing, the vocational expert (VE) testified that an individual who would be absent from work more than four days per month could not sustain gainful employment. (Tr. 64). However, Plaintiff argues that the ALJ did not give this opinion by Dr. Giglio's appropriate weight. (Pl. Br. 19-28).

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 416.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v.

13

Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Furthermore, 20 C.F.R. § 404.1527(d)(2) states: "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." SSR 96-2p requires that "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Dr. Giglio completed a statement in June 2011, and rendered certain opinions in his treatment notes from June, September and November of 2011. (Tr. 240, 243-244, 296, and 308). The ALJ discounted these opinions to the extent they rendered an opinion as to disability (which is an issue reserved to the Commissioner), but gave significant weight to the portions of these opinions related to seizure precautions. (Tr. 19).

On June 29, 2012, Dr. Giglio completed a medical statement regarding Plaintiff's limitations. Dr. Giglio noted that Plaintiff had a medical history of astrocytoma, seizures, and asthma. His symptoms were

14

noted to include seizures and chronic headaches. He was prescribed Keppra and side effects included fatigue, dizziness, nausea, and personality changes. Dr. Giglio opined that Plaintiff could stand and sit for thirty minutes at a time. He could work two hours in an eight-hour day. Plaintiff could lift five pounds occasionally and frequently. He could occasionally bend, stoop, balance, manipulate with his hands, and raise his right and left arm above shoulder level. Plaintiff would occasionally need to elevate his legs. He was to have strict seizure precautions, which included being unable to drive and operate machinery. He could not perform heavy lifting and he could not climb stairs or heights. (Tr. 309).

Dr. Giglio also completed a medical source statement regarding Plaintiff's seizures. It was indicated that Plaintiff experienced non-convulsive seizures, of which there was not always warning. He estimated the seizures occurred about once per week, but Dr. Giglio was unable to quantify with certainty. It was noted that during a seizure the right side of Plaintiff's body would go numb and would subsequently be weak. Other symptoms included tongue bites and general weakness. After a seizure, it was indicated that Plaintiff was confused, irritable, had severe headaches, and was extremely tired after a seizure. Stress and exertion could precipitate his seizures. Dr. Giglio opined that Plaintiff could rarely lift less than ten pounds and never lift more than ten pounds. It was noted that Plaintiff was compliant with his medication, Keppra. Side effects included dizziness, lethargy, coordination disturbance, and personality changes. Dr. Giglio indicated that Plaintiff had abused street drugs in the past, but even if he was able to maintain sobriety, his symptoms and limitations would continue. It was indicated that Plaintiff's impairments were likely to produce good days and bad days, and he would likely be absent more than four days per month as a result of his impairments (Tr. 310-313).

In the ALJ's decision, he found the following with regard to Dr. Giglio's June 2012 opinion:

15

I accord Dr. Giglio's opinions from June 2012 minimal weight. While Dr. Giglio is a treating source, his opinions are inconsistent with substantial evidence of record. First, though Dr. Giglio reported claimant experienced fatigue and nausea due to Keppra, claimant did not allege these side effects and treatment notes do not document repeated complaints of fatigue or nausea. Moreover, someone experiencing substantial fatigue would not be expected to consistently use marijuana. I have otherwise found no limitations related to claimant's allegations of dizziness and mood swings for the reasons described above. Second, though Dr. Giglio opined claimant could only sit or stand 30 minutes at a time, lift up to 5 pounds, and work 2 hours a day, physical examinations of record showed largely normal strength, normal sensation, normal gait, and normal reflexes, and claimant testified he shops, cares for a daughter all day sometimes, visits with friends, takes his daughter to the park, and attends church meetings 3 times a month. Third, though Dr. Giglio reported claimant could only occasionally perform postural and manipulative activities, the record reveals no problems with the left side, examinations showed generally normal strength, examinations revealed normal sensation, reflexes, and coordination, and examinations demonstrated normal musculoskeletal ranges of motion. Fourth, though Dr. Giglio reported weekly seizure activity with loss of consciousness, treatment notes from late 2012 merely document complaints of strange feelings lasting about 2 minutes with no loss of consciousness, claimant is trusted to watch over children, imaging of claimant's brain was described as "stable," and claimant's emergent presentations for seizure activity were associated with noncompliance with medication. Fifth, though Dr. Giglio reported claimant had not abused alcohol or street drugs since May 2011, a urine drug screen in September 2011 was positive for cocaine and THC, and claimant testified he used marijuana about 20 times in the month preceding the hearing. Sixth, though Dr. Giglio reported extended compliance with medication, medical evidence does not make it clear when claimant became compliant with medication. Seventh, though Dr. Giglio reported claimant needed to elevate his legs, the record reveals no symptoms warranting such a limitation. Lastly, though Dr. Giglio reported claimant would probably miss more than 4 days of work per month, physical examinations of record showed modest if any abnormalities, the record reveals no emergent treatment since 2011, and claimant testified that he is trusted to watch over children.

(Tr. 20).

The ALJ accorded this opinion minimal weight, stating that the opinion was inconsistent with

substantial evidence of record (Tr. 20). As an initial matter, the ALJ indicated that Plaintiff did not allege

side effects of fatigue and nausea from Keppra. Plaintiff asserts that the medical statement completed by

Dr. Giglio does not indicate that Plaintiff specifically experienced those side effects, only that Keppra

causes those side effects, and there is no inconsistency (Tr. 309, Pl. Br. 23). Plaintiff testified that when he

gets up in the morning he tries to eat because the Keppra "doesn't agree with [him]." (Tr. 40). Additionally,

October 2011 treatment notes from Dr. Giglio document poor appetite and a significant weight loss, as well

as chronic headaches.  The same records  document reports from Plaintiff's girlfriend of depressed mood,

and/or mood swings (Tr. 330-331). Treatment notes from a November 2011 visit to Dr. Galloway, Ph.D.

document complaints of fatigue and low energy, as well as Plaintiff's "stomach turning" and lightheadedness

in connection with panic attacks. (Tr. 324). It is unclear whether the ALJ specifically considered this

evidence in his decision to discount Dr. Giglio's opinion in its entirety. Additionally, the ALJ notes without

explanation, what appears to be his opinion that "someone experiencing substantial fatigue would not be

expected to consistently use marijuana." (Tr. 20).

Second, the ALJ finds that the limitations described by Dr. Giglio are inconsistent with Plaintiff's

activities of daily living. However, the ALJ does not explain how the activities are inconsistent with the

limitations provided by Dr. Giglio. Plaintiff testified that he helped his daughter get ready for daycare, that

he spent time at his daughter's mother's house on the weekends and "watched Dora[3] all day," possibly

went to the park, but "basically sit[s] at home with my daughter." (Tr. 41). Plaintiff also testified that his

daughter's mother comes and gets him every month to help grocery shop. (Tr. 42). It is unclear how these

limited activities are inconsistent with the functional limitations imposed by Dr. Giglio, thereby justifying

---

[3]Dora the Explorer is an American educational animated TV series. See Wikipedia.

17

disregarding his opinion in total.

The ALJ also stated that Dr. Giglio reported weekly seizure activity with loss of consciousness, but treatment records only documented complaints of strange feelings lasting about 2 minutes with no loss of consciousness (Tr. 20). Plaintiff reported to the Emergency Department in August of 2011 after having had a seizure, which included loss of consciousness (Tr. 271). In September of 2011, it was recorded that Plaintiff had experienced two seizures, both of which were tonic-clonic, or grand mal seizures (Tr. 285, 294). The seizures that involved loss of consciousness occurred when Plaintiff was unable to fill the Keppra prescription for financial reasons. However, even after taking the medication "faithfully," Plaintiff had episodes of feeling tingly in his head and body with a weird sensation and some drooling out of the right side of his mouth (Tr. 294). Dr. Giglio indicated that the right side of his body would be very weak and Plaintiff would be "extremely tired" following these episodes, and that he would need to rest several hours following a seizure (Tr. 310-311). Plaintiff testified that he had two kinds of seizures, grand mal seizures and seizures which made his right side go numb, and that he had not had a grand mal seizure before his surgery (Tr. 44). It appears as though the ALJ determined Plaintiff only had grand mal seizures and then classified his other "episodes" as subjective complaints of strange feelings lasting for about 2 minutes with no loss of consciousness (Tr. 17, 20). However, these episodes are consistently described as seizures by Dr. Giglio. (316, 332). The ALJ fails to explain why the episodes that were not grand mal seizures would not be classified as seizure activity, in light of the fact that Plaintiff's treating neurologist, Dr. Giglio, classified them as such. In October of 2011, Dr. Giglio wrote that Plaintiff's most relevant symptom was continued seizure activity that Plaintiff's girlfriend described as stiffening in his sleep (Tr. 331). Dr. Giglio also continued to increase Plaintiff's Keppra dosage and add additional anticonvulsant medicines due to the seizure activity.

18

(Tr. 316, 319, 320). Dr. Giglio describes the seizures as brief and a "funny feeling" during which Plaintiff's body stopped (Tr. 316). In light of the above, Plaintiff asserts that Dr. Giglio's opinion is not contradicted by the treatment records; as Plaintiff did experience seizures with loss of consciousness, but he also experienced other types of seizures on a more frequent basis. (Pl. Br. 25-26)

Another reason the ALJ accords minimal weight to Dr. Giglio's opinion is because Dr. Giglio reported Plaintiff had not abused alcohol or street drugs since May 2011, but a test several months after that date contradicts this notation. (Tr. 20). The September 2011 urine drug screen (which was positive for cocaine and THC) that the ALJ cites was from a different facility and there is no indication that Dr. Giglio had access to those records (Tr. 291). Accordingly, the record is unclear as to whether Dr. Giglio had documented knowledge of any street drug use either at the time he rendered his opinion, or during the time period covered by his opinion. Notably, the section of the form where Dr. Giglio indicates he does not believe Plaintiff currently abuses alcohol or street drugs, and had not, to the best of Dr. Giglio's knowledge, since May of 2011, contains a follow-up inquiry. If the patient was affirmatively noted to currently abuse alcohol or street drugs, the doctor was asked if the patient would exhibit the symptoms and limitations otherwise described (in the questionnaire), if the patient was able to maintain complete sobriety. Dr. Giglio responded affirmatively. The ALJ provides little insight into his belief that the entirety of this treating physician June 2012 opinion, including the medical and functional findings, would be entitled to minimal weight, based upon the possibility that the physician was incorrect in his belief that there was no abuse of alcohol or street drugs. Accordingly, and in conjunction with the comprehensive discussion on this issue both supra and infra, the court cannot adequately determine whether his decision to accord little

19

weight to Dr. Giglio's opinion on this basis is supported by substantial evidence.[4]

The ALJ also indicated that Dr. Giglio noted that Plaintiff was compliant with medications, but that the medical evidence did not make it clear when claimant became compliant with medication (Tr. 20). Although there is evidence that Plaintiff was not compliant with Keppra in July, August, and September of 2011 in part due to the high cost of the medication (Tr. 268, 272, 279, 285, 294), as of September 16, 2011, the record shows that Plaintiff, with help from Dr. Giglio's office, received patient assistance for Keppra and had been taking it "faithfully" (Tr. 268, 294). After that time, there is no further indication that Plaintiff was not compliant.

Lastly, the ALJ gave Dr. Giglio's opinion that Plaintiff would miss 4 days of work per month minimal weight. The ALJ stated that the physical examinations of record showed modest if any abnormalities (Tr. 20). Plaintiff argues, somewhat persuasively, that those examinations were not performed during seizure activity, and there is no reason that Plaintiff's regular examination would not be normal, with the exception of the continued right-sided weakness that was well documented. (Pl. Br. 27). The ALJ also stated that the record showed no emergent treatment since 2011. However, the record reflects emergent treatment was sought primarily for grand mal seizures. Plaintiff's petit mal seizures continued after 2011, and Dr. Giglio noted the continuing seizure activity and ultimately recommended him for more aggressive treatment than the anticonvulsant medications (Tr. 295, 308, 316, 319, 330, 340, 345, 349). Dr. Jenrette confirmed the need for radiation due to the ineffectiveness of the anticonvulsant medications (Tr. 335).

---

[4]The ALJ notes that Plaintiff testified that he had used marijuana twenty times a month at the time of the hearing, but this would post date Dr. Giglio's June 2012 opinion, and is not relevant to what Dr. Giglio believed that time.

The ALJ discounted Dr. Giglio's June 2012 opinion in its entirety, including the portion of his opinion that included various functional limitations and the opinion that Plaintiff would be absent from work four days a month. However, he gave significant weight to the portions of Dr. Giglio's June and September 2011 treatment note opinions, which included seizure precautions. (Tr. 19-20). As to Dr. Giglio's estimation that Plaintiff would likely miss four days a month, the medical evidence of record gives some credence to this as Plaintiff was hospitalized or seen in the emergency room at least 5 times in an 18 month period post filing his application for SSI. (Tr. 249-250, 279, 271, 285, 349). He also saw Dr. Giglio for routine visits, and treatment notes document continued reports of seizure activity. (Tr. 315, 339). Dr. Giglio is the only treating physician to complete a medical statement specific to Plaintiff's seizures and he treated Plaintiff on a regular basis. No other physician in this record has a treatment history with Plaintiff, akin to that of Dr. Giglio. The Treating Physician Rule requires that if the opinions of a treating source are not adopted as controlling they will be carefully evaluated and contrasted with other medical opinions and evidence in the record pursuant to the specific standards set forth in § 404.1527. The ALJ's decision does not meet that standard.

In summary, it is recommended that this case be remanded to allow the fact finder to evaluate the opinions of the treating physician under the regulatory standards set forth in § 404.1527(c). Upon remand, the opinion of Dr. Giglio should be weighed in light of his examining history and the general deference given examiners when weighed against the opinions of non-examining experts. Any rejection of his opinion should be based on appropriate evidence in the record and in accord with the Treating Physician Rule. To the extent that deference is not provided to the opinion of the treating physician, Dr. Giglio, the ALJ must evaluate the opinions under the § 404.1527(c) standards. Any rejection of Dr. Giglio's opinions should be

based on appropriate evidence in the record and in accord with the Treating Physician Rule and not simply the substitution of the opinion of the ALJ for that of the treating and examining medical sources. Proper application of the Treating Physician Rule may have a significant impact on the Commissioner's Step Three analysis, the determination of a RFC, and on the availability of work for Plaintiff in the national economy at Step Five. Since the ALJ's evaluation of Dr. Giglio's opinion failed to comply with the Social Security Regulations, it is recommended that this action be remanded for proper consideration of the treating physician's opinion. Once the ALJ conducts a proper analysis with respect to the treating physician's opinions, he should reassess Plaintiff's impairments and RFC for a proper review if the issues are not rendered moot.[5]

### III. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Accordingly, **IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED** and that this matter be **REMANDED** to the Commissioner pursuant to sentence four.

Respectfully Submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 17, 2015
Florence, South Carolina

---

[5]In light of this court's recommendation that this matter be remanded for further consideration, the court need not address any remaining issues, as they may be rendered moot on remand. The Court does note that on remand, the ALJ should consider, in conjunction with his evaluation of treating physician Dr. Giglio's opinion, Plaintiff's position as to whether or not he meets the requirements of Listing 11.03, and how Plaintiff's petit seizures may affect Plaintiff's ability to work.