## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

RECEIVED
2015 AUG -4 P 1: 58

| | |
|---|---|
| David Julius Brown, | ) |
| | ) |
| Plaintiff, | ) |
| | )     Civil Action No. 4:14-2470-RMG |
| vs. | ) |
| | ) |
| Carolyn W. Colvin, Commissioner | ) |
| of Social Security, | )     **ORDER** |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff has brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI"). In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 DSC, this matter was referred to a United States Magistrate Judge for pre-trial handling. The Magistrate Judge issued a Report and Recommendation on July 17, 2015, recommending that the Commissioner's decision be reversed and remanded because of the Administrative Law Judge's failure to evaluate the opinions of the medical experts in accord with the Treating Physician Rule, 20 C.F.R. § 404.1527(c). (Dkt. No. 25). The Commissioner has filed objections to the R & R. (Dkt. No. 27). As more fully set forth below, the decision of the Commissioner is reversed and remanded for further action consistent with this order.

### Legal Standard

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo*

determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. The Act provides that the "findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of the factual circumstances that substitutes the Court's findings of fact for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

Although the federal court's review role is a limited one, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

The Commissioner, in passing upon an application for disability benefits, is required to undertake a five-step sequential process. At Step One, the Commissioner must determine whether the applicant is engaged in substantial gainful work. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful employment, the Commissioner proceeds to Step Two, which involves a determination whether the claimant has any "severe medically determinable physical or mental impairment." *Id.* § 404.1520(a)(4)(ii). If the claimant has one

-2-

or more severe impairments, the Commissioner proceeds to Step Three, which involves a determination whether any impairment of the claimant satisfies any one of a designated list of impairments that would automatically render the claimant disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not have a listed impairment, the Commissioner must proceed to Step Four, which involves an assessment of the claimant's Residual Functional Capacity ("RFC"). *Id.* § 404.1520(a)(4)(iv). This requires assessment of the claimant's ability "to meet the physical, mental, sensory, and other requirements of work . . . ." *Id.* § 404.1545(a)(4). In determining the claimant's RFC, the Commissioner "must first identify the individual's functional limitations or restrictions" and provide a narrative "describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . ." SSR 96-8p, 61 Fed. Reg. 34474, 34475, 34478 (July 2, 1996).

Once the claimant's RFC is determined, the Commissioner must assess whether the claimant can do his past relevant work. 20 C.F.R. §§ 404.1520(4)(iv), 1545(a)(5)(i). If the claimant, notwithstanding the RFC determination, can still perform his past relevant work, he is deemed not to be disabled. If the claimant cannot perform his past relevant work, the Commissioner then proceeds to Step Five to determine if there is other available work in the national economy he can perform in light of the RFC determination. *Id.* § 404.1520(a)(4)(v).

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating physicians. 20 C.F.R. § 404.1545. This includes the duty to "evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Special consideration is to be given to the opinions of treating physicians of the claimant, based on the view that "these sources are likely to be the

-3-

medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* § 404.1527(c)(2).  Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians of the claimant are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of factors, including the examining relationship, the treatment relationship, length of treatment, nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician was a specialist. *Id.* §§ 404.1527(c)(1)-(5).  The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions.  SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

## Discussion

Plaintiff was diagnosed in June 2011 with a malignant brain tumor, known as an astrocytoma, and underwent a craniotomy and tumor resection at the Medical University of South Carolina ("MUSC").  Some residual tumor remained, and Plaintiff was thereafter under the continuous outpatient care of Dr. Pierre Giglio, the Medical Director of the Brain and Spine Tumor Program at MUSC and Associate Professor of Neurology and Neuro-Oncology.

-4-

Transcript of Record ("Tr.") 308, 316. Dr. Giglio is board certified in Psychiatry and Neurology.[1]

Shortly after Plaintiff's brain surgery, Dr. Giglio documented that Plaintiff's brain tumor produced "right-sided weakness and a tendency toward seizures." Tr. 240. Dr. Giglio diagnosed Plaintiff with a "low grade astrocytoma" and "seizures." Plaintiff had two generalized tonic-clonic seizures when he ran out of his anti-seizure medication in August and September 2011. Tr. 271, 285, 294. Thereafter, Plaintiff reported repeated episodes of non-convulsive or petit mal seizures. Tr. 308, 310, 315-16, 319, 330, 339-340. Dr. Giglio opined in November 2012 that Plaintiff "continues to have breakthrough seizures that suggest progressive disease." Tr. 340.

Dr. Giglio attempted to treat Plaintiff's seizures with medication but when the seizures persisted he referred Plaintiff to a radiation oncologist, Dr. Joseph M. Jenrette, III, to consider a course of radiation treatment of the tumor to reduce the seizure activity. Tr. 308, 349. Dr. Jenrette is a board certified radiation oncologist and Professor and Chair of the Department of Radiation Oncology at MUSC.[2] Dr. Jenrette documented Plaintiff as having a "malignant brain tumor with right arm and leg weakness and a condition with seizures that are not controllable with anti-seizure medications." Tr. 335. The last note in the record before the Court is a letter from Dr. Jenrette dated January 15, 2013, documenting a plan for daily radiation treatments of Plaintiff's brain tumor. Tr. 338.

---

[1] Licensee Lookup, Pierre Giglio, M.D., South Carolina Board of Medical Examiners Website.

[2] Licensee Lookup, Joseph Malphus Jenrette, III, South Carolina Board of Medical Examiners; Medical University of South Carolina Website, Department of Radiation Oncology.

-5-

Dr. Giglio completed a questionnaire regarding Plaintiff's condition on June 29, 2012, after treating Plaintiff for more than a year. He diagnosed Plaintiff with "low grade astrocytoma," which produced "occasional seizures and chronic headaches." Tr. 309. He estimated Plaintiff had seizures approximately one time per week but indicated he could not "quantify with certainty." Tr. 310. Dr. Giglio documented that when Plaintiff has seizures his "[r]ight side of body goes numb and subsequently very weak." *Id.*

Dr. Giglio also made findings that indicated significant job related limitations. These included a limitation on lifting more than 5 pounds and an inability to sit or stand longer than 30 minutes and work more than two hours per day. Tr. 309. He also opined that Plaintiff would likely be absent more than four days per month because of his condition. Tr. 313. For all practical purposes, these findings, if deemed valid, would render Plaintiff effectively disabled under the Social Security Act.

Subsequent to the preparation of these responses to the questionnaire in June 2012, Dr. Giglio saw Plaintiff in his office on numerous occasions and concluded that Plaintiff's condition was worsening and seizures were not being effectively controlled with medications. Tr. 315-16, 319, 339-340, 345. This finding led to Plaintiff's referral to Dr. Jenrette for radiation treatment of his malignant tumor. Dr. Jenrette confirmed Dr. Giglio's findings of uncontrolled seizure activity and right-sided weakness secondary to Plaintiff's brain tumor. Tr. 335, 338. It is a reasonable premise that Dr. Giglio would not have referred Plaintiff for radiation treatment to his brain, and Dr. Jenrette would not have agreed to provide such therapy, if they did not have sound medical reasons to conclude that the claimant had a serious seizure disorder that was not effectively managed by medications.

-6-

The only other medical opinions provided in the record were produced by two non-examining and non-treating physicians, Dr. Angela Saito, and Dr. James Haynes. Tr. 232-39; 300-07. Neither physician has any documented expertise in the management or treatment of seizure disorders secondary to a malignant brain tumor, and there is no evidence that they have ever been in Plaintiff's physical presence. Dr. Saito prepared her report in May 2011, prior to Plaintiff being evaluated and treated at MUSC. It appears that Dr. Saito was unaware of the diagnosis of Plaintiff's malignant brain tumor, his craniotomy in June 2011 or his persistent post-operative seizures. Tr. 237. Dr. Haynes prepared his report on October 5, 2011, and, thus, did not have access to Plaintiff's subsequent MUSC treatment records, which included five office visits with Dr. Giglio between October 26, 2011, and December 7, 2012, and reports regarding Dr. Jenrette's assessment and treatment plan in December 2012 and January 2013. Tr. 300-07, 308, 315-16, 331, 335, 338, 339-40, 345. Dr. Haynes opined in his October 2011 report that Plaintiff's condition placed no significant limitations on his ability to lift, sit or stand.[3] Tr. 301.

Under the standards of the Treating Physician Rule, the opinions of the treating specialist physicians would normally be accorded substantially more weight than the opinions of the non-treating, non-examining, and non-specialist physicians. Further, the failure of the non-examining physicians in this matter to review highly material medical records would normally further diminish the weight normally given to such opinions. But despite the provisions of the Treating Physician Rule and the limited scope of the medical records actually reviewed and considered by

---

[3] For example, Dr. Haynes concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds regularly. On the other hand, Dr. Giglio found that Plaintiff could not lift more than 5 pounds, even occasionally. Tr. 301, 309. Both treating physicians, Dr. Giglio and Dr. Jenrette, found that Plaintiff has right side weakness secondary to his brain tumor. Tr. 310, 335.

the non-examining experts, the ALJ gave "significant weight" to the opinions of Dr. Haynes, "some weight" to the opinions of Dr. Saito, and "minimal weight" to the opinions of Plaintiff's treating specialist physicians, Dr. Giglio and Dr. Jenrette. Tr. 18, 19, 20, 21.

This curious result is produced by the ALJ's seeming willful disregard for the clearly established standards of the Treating Physician Rule. It should be remembered that the Treating Physician Rule is a duly adopted regulation proposed by the Commissioner and ratified under the Administrative Procedures Act by Congress. The Rule constitutes binding legal authority which the Commissioner is obligated to respect and enforce. The Treating Physician Rule provides substantial deference to the opinions of treating providers and requires all medical opinions, including the opinions of non-examining chart reviewers, to be weighed under the same standards. Has the physician examined the patient? Has the physician treated the patient and, if so, for how long? Does the physician have any special expertise? Have the physician's opinions been consistently held and are they supported by the record? § 404.1527(c). There is no suggestion in the ALJ's decision that he measured and contrasted the opinions of the various medical experts under these binding legal standards.

One of the significant factors set forth in the Treating Physician Rule is the special weight given to a specialist physician. The Commissioner pledges to "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist." § 404.1527(c)(5). The ALJ articulated no special weight given to Dr. Giglio, whose practice focuses on the management and treatment of malignant brain tumors and is the Medical Director of the brain tumor treatment program at South Carolina's premier medical facilty, MUSC. Under the standards of the Treating Physician Rule, it is hard to

-8-

imagine a physician whose opinions would be entitled to more weight than Dr. Giglio's. The ALJ did, however, accord special weight to the opinions of Dr. Saito and Dr. Haynes for their alleged expertise in "applying Social Security disability law and policy." Tr. 18, 19. Being a physician chart reviewer for the Social Security Administration is *not* an area of speciality entitled to special weight under the Treating Physician Rule. The ALJ's failure to accord special weight to Plaintiff's treating specialist physicians and the ALJ's provision of special weight to Social Security chart reviewers as specialist physicians both constitute clear legal error.

This was but one of many legal errors of the ALJ, all emanating from a effort to avoid the clear import of the standards of the Treating Physician Rule. The problem began early in the sequential analysis, when the ALJ failed to list Plaintiff's seizure disorder as a severe impairment under Step Two. Tr. 13. It is well settled that a "severe impairment" is any condition "that limits an individual's ability to perform basic work activities." 20 C.F.R. § 416.920(c). This is generally regarded as a relatively low bar, particularly in a situation such as here where the ALJ recognizes that the Plaintiff required seizure precautions. Tr. 19.

The omission, in the Court's view, is more than mere oversight by the ALJ. While recognizing that Plaintiff has "some seizure activity and right sided weakness," the ALJ clearly second guesses Dr. Giglio's diagnosis that the seizure disorder is a serious condition that was not effectively managed on medications and required radiation therapy to treat the seizure symptoms. Tr. 21. Dr. Giglio's opinions regarding Plaintiff's serious seizure disorder were shared by Dr. Jenrette, the Chair of MUSC's Radiation Oncology Department and another treating physician of Plaintiff. No physician with any expertise in this highly sophisticated and specialized area of medicine has offered any opinion seriously challenging the findings and conclusions of these two

-9-

highly skilled treating physicians.   In the absence of any substantial medical opinion challenging

the findings of the treating specialist physicians, the Court can only conclude that the ALJ, in

concluding that Plaintiff's seizure disorder is really not all that serious, has substituted his

personal medical opinions for those of the treating physicians.  This is, of course, clear legal

error.

   In a further effort to undermine the weight given to the opinions of Plaintiff's treating

physicians, the ALJ unleashed a series of criticisms of Dr. Giglio's June 2012 responses to a

questionnaire that appear to the Court to be mostly much ado about nothing and do not constitute

good reasons to disregard the opinions of Dr. Giglio.  The Magistrate Judge thoroughly addressed

many of the ALJ's dubious criticisms in his R & R and the Court finds it unnecessary to repeat

them in full here.  (Dkt. No. 24 at 16-21).   A few, however, are worthy of special note.

   The ALJ harshly criticized Dr. Giglio for answering "May 2011" to the question of when

"to the best of your knowledge" did your patient last "abuse alcohol or street drugs."  Tr. 20, 312.

The ALJ then documented that subsequent records (apparently unknown to Dr. Giglio) indicated

that Plaintiff had tested positive and admitted using illicit drugs, primarily marijuana.  Tr. 20.

The ALJ appears to suggest that, because *later* testing or records indicated that Plaintiff was a

frequent marijuana user, that Dr. Giglio's opinions regarding the Plaintiff's malignant brain

tumor and its complications are unworthy of belief?  The ALJ also conveniently ignores another

response of Dr. Giglio's in June 2012, in which he opined that even if Plaintiff refrained from

any illicit drug use he would still have the symptoms and limitations Dr. Giglio had described. Tr. 312.[4]

Another reason the ALJ indicated he gave minimal weight to Dr. Giglio's opinions is because Plaintiff babysits his children, which the ALJ apparently believes is inconsistent with a serious seizure disorder. Tr. 20. The fact that Plaintiff is allowed by his family to babysit is a family decision that may be wise or may be foolish, but it tells us very little about whether Dr. Giglio's opinions are medically valid. Dismissing Dr. Giglio's medical opinions because of family child care decisions makes no sense.

The ALJ also challenges Dr. Giglio's opinions limiting lifting to 5 pounds and finding that he would likely miss work four or more days per month. One would presume that a physician who devotes his practice to the management of malignant brain tumors and who has treated Plaintiff over an extended period of time would have well-informed opinions regarding his ability to lift and tolerate work. Indeed, a key presumption of the Treating Physician Rule and its heavy deference to treating physicians is based on the premise that such physicians are "the medical professionals most able to provide a detailed longitudinal picture of your medical impairment(s)" and "bring a unique perspective to the medical evidence that cannot be obtained

---

[4] This is potentially a significant finding if the ALJ seeks to disallow Plaintiff's disability claim because he uses marijuana. If a claimant is determined to be disabled and is also found to abuse drugs or alcohol, a determination must be made whether the claimant would still be disabled if he did not abuse drugs or alcohol. If the claimant would still be disabled without the drug or alcohol abuse, the abuse of drugs or alcohol would not be considered a material factor to the disability and would not disqualify the claimant from benefits. 20 C.F.R. § 404.1535. Thus, the fact that Plaintiff might use marijuana does not in and of itself disqualify Plaintiff from Social Security disability benefits. In the event Plaintiff is determined to be disabled under the Social Security Act, the ALJ would then need to evaluate the evidence relating to Plaintiff's illicit drug or alcohol abuse in light of the standards set forth in § 404.1535 to determine if such abuse is material to the finding of disability.

from objective medical findings alone or reports . . . ." § 404.1527(c)(2). Rather than provide

special deference to Dr. Giglio as a treating specialist physician, the ALJ second guessed his

opinions and improperly substituted his medical opinions for those of the treating physicians.[5]

## Conclusion

In sum, the decision of the ALJ is deeply flawed because it fails to accord special

deference and weight to the opinions of the treating specialist physicians, as required by the

Treating Physician Rule, and accords special weight only to non-examining and non-treating

physicians on the erroneous premise that they are specialists in "applying Social Security law and

policy." Tr. 18, 19. The Court **ADOPTS** the R & R of the Magistrate Judge as the order of the

Court (Dkt. No. 24), as further supplemented by this order; **REVERSES** the decision of the

Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g); and **REMANDS** this matter to

the agency for further action consistent with this decision.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Judge

Charleston, South Carolina
August 4, 2015

---

[5] The best evidence that the ALJ substituted his own opinions for those of the treating
physician in regard to the lifting issue is that he made a finding unsupported by *any* physician.
The only competing opinion to Dr. Giglio's 5-pound weight lifting limit was Dr. Haynes' opinion
that Plaintiff could regularly lift 25 pounds and occasionally lift 50 pounds. Tr. 301, 309. The
ALJ disregarded both opinions and found Plaintiff was limited to light work, which anticipates
an ability to lift 10 pounds regularly and 20 pounds occasionally. 20 C.F.R. § 404.1567. The
ALJ provides no record evidence to support that specific weight finding.